## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

1.     I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2017. I am currently assigned to a cyber-crime squad at the FBI Honolulu Field Office in Kapolei, Hawaii. I attended the FBI Academy in Quantico, Virginia, which entailed 21 weeks of training in law enforcement and investigative activities. My current duties include investigating cyber and financial crime as well as responding to violations of Federal law aboard aircraft and in the airport environment in the District of Hawaii. Previously, I was an U.S. Army Officer for four years and a government contractor for one year.

2.     I have knowledge of the information contained in this affidavit through my own investigative activities, review of investigative reports and other documents discovered during this investigation, and conversations with other law enforcement officers who have participated in this investigation.

3.     This affidavit is in support of a criminal complaint charging Paul Anthony NIEDERREITER ("NIEDERREITER") with a violation of Title 49, United States Code, Section 46504, Interference with flight crew members and attendants, which occurred on August 11, 2018 while onboard Hawaiian Airlines

flight 42 outbound from Kahului Airport, Maui (OGG) to San Francisco

International Airport (SFO).

4.     The facts set forth in this affidavit are based on my personal

observations, my training and experience, and information obtained from other law

enforcement officers and witnesses.   This affidavit is intended to show that there

is probable cause for the requested complaint and does not purport to set forth all

of my knowledge or investigation into this matter.

## BACKGROUND

5.     Title 49, United States Code, Section 46504, provides:

> An individual on an aircraft in the special aircraft jurisdiction
> of the United States who, by assaulting or intimidating a flight
> crew member or flight attendant of the aircraft, interferes with
> the performance of the duties of the member or the attendant or
> lessens the ability of the member or the attendant to perform
> those duties, shall be fined under title 18, imprisoned for no
> more than 20 years, or both.

6.     An offense falls within the "special aircraft jurisdiction" of the United

States when it is committed while the aircraft is "in flight."   49 U.S.C. § 46501(1).

An aircraft is "in flight" from the time the aircraft doors are closed after boarding,

until the doors are opened again.   To "intimidate" means to place a person in

reasonable apprehension of bodily harm, either to that person or to another.

7.     At the time of this incident, Hawaiian Airlines flight 42 was in the

Special Aircraft Jurisdiction of the United States, because it was in flight en route

from Kahului, Maui (OGG) to San Francisco International Airport (SFO).
Hawaiian Airlines flight 42 departed Kahului, Maui at approximately 2:10 p.m.
Hawaii Standard Time (HST) on August 11th, 2018. NIEDERREITER was a
passenger onboard Hawaiian Airlines flight 42.

8. As described in greater detail below, there is probable cause to believe
that NIEDERREITER violated and attempted to violate 49 U.S.C. § 46504 by,
among other things: yelling and cursing at flight attendants and passengers;
refusing to follow the instructions of flight attendants, including by refusing
requests to calm down; kicking the bulkhead; and being obnoxious and belligerent
towards flight attendants, all while intoxicated and under the influence of alcohol.

## PROBABLE CAUSE

9. On August 11th, 2018, FBI Special Agent Thomas Logeman and I
interviewed Jamie A. Yoshioka, a flight attendant onboard Hawaiian Airlines flight
42 who stated, among other things, the following:

a. Yoshioka stated that she was the "number two" flight attendant
aboard Hawaiian Airlines flight 42. The flight initiated from Kahului Airport in
Maui, Hawaii, and was headed to San Francisco, California. Yoshioka first noticed
NIEDERREITER and his companion, Jane Ellen Donoghue, when they boarded
the plane as they were one of the first groups to board. Yoshioka noticed

6

NIEDERREITER was having a difficult time moving through the cabin to his seat,
which was seat 14G.

   b.      The flight departed at 2:10pm Hawaii Standard Time (HST).
After approximately 15-20 minutes, Yoshioka and the other flight attendants rose
from their seats to begin meal and beverage services. NIEDERREITER observed
Yoshioka pass by his seat carrying a blanket and asked Yoshioka if he could have
one. Yoshioka informed NIEDERREITER he could and that the blankets were for
purchase at a price of ten dollars. NIEDERREITER abruptly declined, and
appeared to become agitated to the point his travel companion, Donoghue,
intervened and told Yoshioka it was okay and again informed NIEDERREITER it
would cost ten dollars.   NIEDERREITER again declined.

   c.      After another ten minutes, Yoshioka noticed NIEDERREITER
get up and enter one of the lavatories.   Yoshioka estimated that NIEDERREITER
was in the lavatory for approximately ten minutes, and certainly longer than a
normal passenger's use.   Yoshioka became further concerned when she heard a
loud knock emanating from the lavatory NIEDERREITER was in. Fearing
NIEDERREITER may have possibly fallen, Yoshioka approached the lavatory
NIEDERREITER was in and knocked on the door to check on him. Yoshioka
stated NIEDERREITER flung open the lavatory door while seated on the toilet

7

with his shorts down to his ankles and shouted something to the effect of "I'm

taking a poop! I'm not smoking in here!" Yoshioka closed the door as soon as it

flung open to offer NIEDERREITER privacy. Yoshioka was unsure if

NIEDERREITER used the verbiage "poop" or "shit."

      d.    When NIEDERREITER exited the lavatory, he returned to his

seat further agitated and yelled something to the same effect of the phrase he

earlier yelled at Yoshioka of "I'm taking a poop! You're trying to accuse me of

smoking!" Yoshioka tried to calm NIEDERREITER down by denying any

accusations of him smoking and tried to explain her concern for him, but it was to

no avail and NIEDERREITER continued to get louder and more agitated. Fearing

for her safety and the passengers around NIEDERREITER, Yoshioka separated

herself from contact with NIEDERREITER and walked to the rear of the plane to

inform other flight attendants to try to deal with him and calm him down.

      e.    One flight attendant informed Yoshioka that she could hear

NIEDERREITER yelling at the back of the plane during this altercation. Yoshioka

later informed the captain/pilot of her encounter with NIEDERREITER and he

decided to divert the flight to Honolulu out of concern for the safety of the crew

and passengers aboard the flight.

      f.    Yoshioka further stated that she believed and feared that had

8

she not separated herself from contact with NIEDERREITER when she did, that she did not know what NIEDERREITER would have done, however she did not want to risk assault on herself, other passengers, or other crew members. Yoshioka later learned that NIEDERREITER gave the middle finger to another flight attendant, kicked the bulkhead area near his seat in an aggressive manner, which was also witnessed by a flight attendant and a male seated in seat 14H.

g.    Yoshioka was informed that the other flight attendants tried to calm NIEDERREITER down to no avail and that NIEDERREITER only became apologetic, calmed down, and asked for the flight to not be turned around when the pilot announced over the P.A. system that they would be diverting to HNL.

10.    On August 12th, 2018, I reviewed the interview notes   from FBI Supervisory Special Agent Jeffrey Felmann, who interviewed Harry Raikes, the Hawaiian Airlines pilot onboard flight 42 who was the captain for that flight, who stated, among other things, the following:

a.    Approximately half way through the flight, Raikes was contacted by the head flight attendant and was told there was an unruly male passenger aboard the plane who was yelling and the flight attendants and was in the process of causing a physical altercation as his actions were escalating.

b.      Raikes contacted dispatch to advise them of the situation and they determined to classify the situation as a "level one" incident, which required the crew to turn the plane around out of abundance of caution and for the safety of the passengers and crew.

11.     On August 12th, 2018, I reviewed the interview notes  from FBI Supervisory Special Agent Jeffrey Felmann, who interviewed Elizabeth Ah-Loy, a Hawaiian Airlines flight attendant onboard flight 42 who was the head flight attendant for that flight, who stated, among other things, the following:

a.      Approximately half way through the flight, Ah-Loy was assisting the pilots with taking a break when she was contacted by other flight attendants reporting a disturbance on the flight.

b.      Ah-Loy was informed by the other flight attendants that a male passenger was yelling and cursing at flight attendants and other passengers.

c.      Ah-Loy made her way to where the male passenger was and told him that if he did not calm down, the flight crew might have to take certain actions which included possible turning the flight around and returning to Honolulu.

10

d.    Ah-Loy was already concerned for the safety of the passengers and crew because of the comments made by this male passenger and the gestures he was making and that he was becoming more belligerent as time went by.

e.    After Ah-Loy spoke with the male passenger, he then began physically kicking the bulkhead and told Ah-Loy "turn it around."    Ah-Loy was very concerned and communicated the details of what was taking place to the captain.

12.    On August 12th, 2018, I reviewed the interview notes   from FBI Supervisory Special Agent Jeffrey Felmann, who interviewed Jessica Kaneshiro, a Hawaiian Airlines flight attendant onboard flight 42, who stated, among other things, the following:

a.    Approximately half way through the flight, Kaneshiro was moving a cart through the aisle when she heard a male passenger yelling. Kaneshiro moved toward the passenger and asked him if he was okay. The male passenger was yelling and saying things like "I was just trying to take a shit and she wouldn't let me take a poop".

b.    As Kaneshiro approached the male passenger, he looked as Kaneshiro and flipped her off with his middle finger. Because of the male

11

passenger's comments and actions, Kaneshiro was concerned for the passengers' safety as well as her own.

13.     On August 12th, 2018, I reviewed the interview notes   from FBI Supervisory Special Agent Jeffrey Felmann, who interviewed Jane Donoghue, the companion who was traveling onboard flight 42 with NIEDERREITER, who stated, among other things, the following:

a.     Donoghue was an acquaintance of NIEDERREITER. They had not seen each other for over twenty six years. NIEDERREITER recently contacted Donoghue and asked her to join him on a trip to Maui.

b.     Donoghue and NIEDERREITER spent the last week in Maui together.

c.     Donoghue stated that NIEDERREITER had been drinking prior to boarding. Donoghue was seated next to NIEDERREITER on Hawaiian Airlines flight 42.

d.     While on the flight, Donoghue observed NIEDERREITER get up from his seat and use the bathroom. She noticed one of the flight attendants knock on the lavatory door. Donoghue heard the flight attendant ask if NIEDERREITER was smoking in the lavatory and NIEDERREITER yell at her in

response. After yelling at the flight attendant, NIEDERREITER became increasingly obnoxious and belligerent to the flight attendant and others.

      e.    As NIEDERREITER made his way back from the lavatory to his seat, he continued to yell and raise his voice, announcing to the passengers what he was doing in the lavatory.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

14.    Based on the foregoing, there is probable cause to believe that Paul

NIEDERREITER violated Title 49, United States Code, Section 46504,

Interference with Flight Crew Members and Attendants, because he knowingly

intimidated and attempted to intimidate a flight crew member or flight attendant of

an aircraft in flight, by placing or attempting to place a flight crew member or

flight attendant in reasonable apprehension of bodily harm either to themselves or

to another person.

FURTHER AFFIANT SAYETH NAUGHT

DATED: Honolulu, Hawaii, August 13, 2018

Liam McGrail
Special Agent-FBI


KEVIN S.C. CHANG
UNITED STATES MAGISTRATE JUDGE

14